**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

NAOMI LAYCOCK,

Plaintiff,

v. Case No. 1:23-cv-01050-JCH-JFR

JESSICA VIGIL-RICHARDS,
NICOLETTE GARCIA, HOBERT SHARPTON,
NEW MEXICO CORRECTIONS DEPARTMENT,

Defendants.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**THIS MATTER** is before the Court on (1) Defendant Jessica Vigil-Richards's Sealed Motion for Summary Judgment Based Upon Qualified Immunity, ECF No. 118; and (2) Defendant New Mexico Corrections Department's ("NMCD") Sealed Motion for Summary Judgment on the Basis of Eleventh Amendment Immunity, ECF No. 119. Both motions challenge Plaintiff Naomi Laycock's allegations that her rights under the Eighth and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Rehabilitation Act, 29 U.S.C. §§ 701-796, were violated when detained at the Western New Mexico Correctional Facility ("WNMCF"). *See* ECF No. 43 at 11-15, ¶¶ 102-134 (inhumane conditions of confinement and inadequate medical care claims), 15-18, ¶¶ 135-57 (failure to accommodate claims).

Having considered the parties' briefing, the applicable law, and being otherwise fully informed, the Court will (1) **GRANT** Vigil-Richards's motion for summary judgment, ECF No. 118; and (2) **GRANT** NMCD's motion for summary judgment, ECF No. 119.

## BACKGROUND[1]

### I. Factual Background

Laycock's pretrial detention began in the summer of 2020. *See* ECF No. 43 at 3 ¶¶ 19, 24. After she turned herself in to the authorities in August 2020, she was detained at the Otero Country Detention Center ("OCDC"). *Id.* ¶ 24. During this time, Laycock was pregnant and in the throes of psychosis. *See id.* at 5 ¶ 40; UMF 23; AMF C. Months later, Laycock was transferred to WNMCF. *See* UMF 1. She alleges this court-ordered transfer occurred so she might receive more acute medical and mental healthcare for her co-occurring medical and mental health conditions. ECF No. 43 at 5 ¶¶ 39-41, 43. Pertinent here, Laycock was detained at WNMCF from November 12, 2020, to March 1, 2021. *See* UMF 1; ECF No. 118-1 at 1-2.

Pursuant to NMCD policy, WNMCF could house county jail inmates, like Laycock, while they awaited trial. ECF No. 119-1 at 2; *see* ECF No. 43 at 5 ¶ 45 ("[Laycock] was initially detained at WNMCF as a pre-trial county hold."). The same NMCD policy provided, "County jail inmates should also receive programs and services comparable to those received by similarly situated inmates who are housed in the county jail from which the inmate was transferred." ECF No. 119-1 at 2 ¶ D.

Vigil-Richards was the warden at WNMCF when Laycock arrived. *See* UMF 3. Laycock claims the pair communicated during her detention, but the chronology of their interactions is

[1] The Court has determined the relevant facts based on the parties' submissions. The undisputed material facts ("UMFs") and the additional material facts ("AMFs") refer to those portions of facts set forth in the parties' respective briefs that the opposing party did not dispute or failed to refute with supporting evidence. Where facts are genuinely disputed, the Court views them in the light most favorable to Laycock, the party opposing the grant of summary judgment. *See In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 964 (10th Cir. 2022). Pursuant to this District's Local Rules, NMCD adopts by reference the UMFs from Vigil-Richards's motion for summary judgment, ECF No. 118. ECF No. 119 at 2. Accordingly, the Court refers to these UMFs by the paragraphs assigned in Vigil-Richards's motion for summary judgment.

unclear on the undisputed facts. *See* AMFs E, G; ECF No. 133-11 at 2-3 (9:18-10:9). Defendant Dr. Hobert Sharpton oversaw the provision of medical services at WNMCF and was an employee of Wexford Health. UMF 20. He provided Laycock medical care ten to twelve times during her detention. UMF 30. Defendant Laura Sedillo, an employee of Centurion Health, was in charge of WNMCF's mental health services.[2] UMF 21.

### A. Laycock's Mental Health Evaluations and Initial Detention

As documented in various medical records, Laycock arrived at WNMCF with a history of mental illness, self-harm, and attempted suicide. *See* UMFs 22-23. During an initial mental health screening, Laycock disclosed the details of her health history to a member of WNMCF's behavioral health staff. *See* UMF 22. This included discussion of her inpatient psychiatric hospitalization, schizophrenia and bipolar disorder diagnoses, "expressly violent behavior," and prescriptions for psychotropic medications. *See* UMFs 22, 23; ECF No. 118-10 at 1. Afterwards, WNMCF behavioral health staff prescribed Laycock medications and implemented ongoing behavioral and psychological monitoring. *See* UMF 23; ECF No. 118-10 at 1 (noting Laycock was to "be monitored by" behavioral health and "medical/psych while at WNMCF").

WNMCF behavioral health staff also recommended Laycock be placed in the Long Term Care Unit ("LTCU"). *See* UMFs 5-6; *see* ECF No. 118-1 at 2. The LTCU was specifically designed to house and care for inmates with complex medical needs. UMF 6. It included a nursing station and was staffed with medical personnel. UMF 7. Due to its specialized nature, WNMCF medical providers ordinarily determined whether an inmate was housed in the LTCU. UMF 6.

Six days after Laycock's arrival, Sharpton conducted a physical health screening of her. UMF 24. He reported she had no immediate, physical medical issues. *Id.*; *see generally* ECF No.

[2] Neither Wexford Health nor Centurion Health are parties to this action.

118-11. The same day,[3] Laycock spoke with WNMCF behavioral health staff and made suicidal statements. UMF 25; *see* ECF No. 118-4 at 1. This prompted behavioral health staff to place Laycock on "therapeutic watch" to "guard against the possibility of self-harm." UMF. 8; ECF 118-4 at 1. WNMCF staff implemented this form of psychiatric supervision when an inmate was deemed to be a danger to themselves or others. *See* UMF 8; ECF No. 118-5 at 2-3 (16:25-17:1). At all hours of the day, a WNMCF official was to keep a constant line of sight on the detainee on therapeutic watch. UMF 9; *see* ECF No. 118-5 at 3 (17:3-6).

Laycock was held in the LTCU for twelve days before being moved to unit WW6. UMFs 5, 10. The record reveals no additional information about this unit or the motives for her transfer from the LTCU. She was housed in WW6 for one week. UMF 10. Afterwards, Laycock was transferred to another unit: J Pod. UMF 11; *see* ECF No. 118-1 at 2. Again, the record does not explain why she was moved nor detail the location or conditions in J Pod.

A day after Laycock was transferred to J Pod, WNMCF behavioral health staff conducted another psychiatric assessment of her. UMF 26. After, Laycock was prescribed medications and recommended to return to the physiciatric care clinic in thirty days. ECF No. 118-12 at 3-4.

Days later, Laycock punched a wall with her first and slammed her head on a desk. UMF 27; *see* ECF No. 118-13 at 1. After being escorted to the infirmary, Laycock was seen by both medical and behavioral health staff. ECF No. 118-13 at 1. Laycock was also placed on therapeutic

[3] While the parties do not dispute the date of this event (November 18, 2020), the Court must note a discrepancy in the cited exhibit and UMFs. *See* UMFs 8, 25; ECF No. 118-4. The at-issue UMFs state Laycock was placed on therapeutic watch on "November 18, 2020," and cite to an Incident Report Cover Sheet, ECF No. 118-4. This is document reads, "Date of Incident: *November 12*, 2020," while the text below reads, "On *September* 18, 2020 a type II incident occurred. . . ." *Id.* at 1 (emphasis added). September 18, 2020, predates when Laycock arrived at WNMCF on November 12, 2020. *See* UMF 1.

watch again. UMF 28; *see* ECF No. 118-13 at 1. Laycock remained in the LTCU from then until she gave birth in March 2021. UMF 14.

**B. Laycock's Medical Appointments After Return to the LTCU**

Many medical appointments followed Laycock's re-housing in the LTCU. They began with medical staff visiting Laycock for five consecutive days, beginning on December 10, 2020. UMF 29. At the same time, she was offered individual treatment on an as-needed basis by WNMCF psychiatry. UMF 32. During the weeks that followed, her medical appointments continued. She saw WNMCF medical staff on December 23, 2020, January 1, 8, 11, 25, and 28, 2021, and February 22 and 24, 2021. UMF 29. She also attended off-site medical appointments on December 23, 2020, January 14, 2021, February 24, 2021, and March 1, 2021. UMF 31.

During her off-site appointment on December 23, 2020, Laycock attempted to flee custody. UMF 16. She tried to elude two correctional staff members and ran into the parking lot. UMF 17. The next time Laycock was transferred off-site, on February 24, 2021, Laycock was placed in restraints. UMF 18. This was because Vigil-Richards issued a transport order requiring correctional staff place Laycock in restraints when she was taken off-site. *Id.*; *see* AMF S; ECF No. 118-8 at 2.

**C. Laycock's Labor and Delivery**

Laycock went into labor on March 1, 2021, and was taken to the hospital. *See* UMFs 14, 31. It is unclear how many correctional staff escorted Laycock to the hospital, who they were, and whether they remained with her the entire time she was in labor and delivery—the undisputed record provides no details. It is similarly unclear how Laycock's labor and delivery transpired. The Inpatient Notes is the only exhibit presented that provides some details. *See* ECF No. 133-10.

As documented therein, the attending physician requested correctional staff remove Laycock's wrist and ankle cuffs during her labor and delivery. *Id.* at 1. The correctional staff

removed only the ankle cuffs, as they needed approval to remove the wrist restraints. *Id.* There is no evidence as to whether the wrist restraints were removed, if or when they were taken off, or which correctional officers were responsible. After giving birth to her daughter, Laycock returned to WNMCF. *See* ECF No. 118-1 at 2.

## II. Procedural Background

Laycock sued Defendants almost three years after the events described above.[4] *See* ECF No. 1. In her First Amended Complaint ("FAC"), she alleges: (1) Vigil-Richards, Sharpton, and Garcia violated her rights under the Due Process Clause of the Fourteenth Amendment for inhumane conditions of confinement and inadequate medical care; (2) NMCD violated 42 U.S.C. § 12101 of the ADA; and (3) NMCD violated 29 U.S.C. § 701 of the Rehabilitation Act. ECF No. 43 at 11-19. Under her first cause of action, alongside her inhumane conditions of confinement and inadequate medical care allegations, Laycock claims she was unconstitutionally shackled during her detention at WNMCF. *Id.* at 10 ¶¶ 89, 91-93.

One year after Laycock filed her FAC, Vigil-Richards and NMCD (collectively "NMCD Defendants") respectively moved for summary judgment.[5] *See generally* ECF Nos. 118, 119. In her motion for summary judgment, Vigil-Richards asserts qualified immunity shields her from

---

[4] Laycock originally sued Laura Sedillo and Nicolette Garcia. ECF No. 43 at 1. Laycock voluntarily dismissed her claim against Sedillo. ECF No. 96. Later, she moved for default judgment against Garcia as a sanction under Rule 37(b) of the Federal Rules of Civil Procedure. *See* ECF No. 147. The Court granted that motion. *See* ECF No. 148.

[5] Each NMCD Defendant moved to seal their own motion for summary judgment to protect Laycock's private medical records. ECF No. 115. The Court granted the motion. ECF No. 117. Using its discretion, the Court does not seal this Memorandum Opinion and Order in line with the "long recognized . . . common-law right of access to judicial records." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007); *see Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) (discussing courts' discretion to seal documents and weigh "the public's right of access" against "competing interests").

liability for Laycock's claim of inadequate medical care under the Fourteenth Amendment. *See* ECF No. 118 at 2 ("Warden Vigil-Richards was not deliberately indifferent to [Laycock]'s medical needs." "Warden Vigil-Richards was not deliberately indifferent to [Laycock]'s mental health needs."); *see also* ECF No. 142 at 10.

On the other hand, NMCD argues Eleventh Amendment immunity bars Laycock's ADA and Rehabilitation Act claims because she has not shown that she was excluded from participation in or denied the benefits of WNMCF's services, programs, or activities either by reason of or due to her disability. ECF No. 119 at 6.

## LEGAL STANDARDS

### I. Summary Judgment under Federal Rule of Civil Procedure 56

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1261 (10th Cir. 2022). "The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022).

In opposing summary judgment, the non-movant cannot rest on mere allegations "but must bring forward specific facts showing a genuine issue for trial." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). The summary judgment standard requires the Court "construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in [her]

favor." *Beauford*, 35 F.4th at 1261. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).

## II. Qualified Immunity in a Motion for Summary Judgment

A defendant's assertion of qualified immunity alters the ordinary summary judgment analysis. *See Nelson v. McMullen*, 207 F.3d 1202, 1205-06 (10th Cir. 2000) ("This difference arises from the unique nature of qualified immunity, which is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial."). When a defendant utilizes this defense, the onus on summary judgment shifts from the defendant to the plaintiff. *Beauford*, 35 F.4th at 1261. Under this paradigm, the Court engages in a two-step inquiry to determine whether summary judgment is appropriate. Applied here, Laycock is required to demonstrate on the facts alleged that: (1) Vigil-Richards's actions violated Laycock's constitutional or statutory rights, and (2) "the right was clearly established at the time of the alleged misconduct." *Id.* This is a "demanding standard." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Vigil-Richards will only bear the "traditional burden of the movant for summary judgment" "[i]f, and only if," Laycock "meets this two-part test." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018). Should Laycock fail "to satisfy either part of the inquiry, the [C]ourt must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

# DISCUSSION

## I. Vigil-Richards's Motion for Summary Judgment, ECF No. 118

The Eighth Amendment to the United States Constitution prohibits the use of "cruel and unusual punishment" on convicted inmates. U.S. Const. Amend. VIII. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding "only the unnecessary and wanton infliction of pain" implicates the Eighth Amendment). The Eighth Amendment, and related precedent, applies to the states via the

Fourteenth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 296 (1991). Meaning, pretrial detainees and convicted inmates are entitled to the same minimum standards of care during their incarceration. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). This includes providing "humane conditions of confinement" and that prison guards "must ensure that inmates receive adequate food, clothing, shelter, and medical care" and "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In addition to ensuring inmates receive proper medical care, prison officials must also guarantee detainees are given mental health care for their psychological conditions. *See Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) ("The states have a constitutional duty to provide necessary medical care to their inmates, including psychological or psychiatric care."); *Bee v. Greaves*, 744 F.2d 1387, 1395 (10th Cir. 1984) ("[T]he jail is under a constitutional duty to treat the medical needs of pretrial detainees, and such treatment includes mental as well as physical disorders." (citation modified)). In sum, "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of [hu]man[kind]." *Trop v. Dulles*, 356 U.S. 86, 100 (1958).

Here, Vigil-Richards argues she "was not deliberately indifferent to [Laycock]'s medical needs," nor her mental health needs, so Laycock has not demonstrated a constitutional violation. ECF No. 118 at 2, 12-13. Therefore, Vigil-Richards contends qualified immunity applies. *Id.* at 2.

This doctrine "is strong stuff" because it "shields public officials from suit as long as their conduct did[ not] infringe any legal rights clearly established at the time." *Blackmon v. Sutton*, 734 F.3d 1237, 1239 (10th Cir. 2013). Analyzing Vigil-Richards's qualified immunity defense entails two steps. First, the Court considers whether Laycock's asserted constitutional rights were "clearly established" prior to Vigil-Richards's alleged actions. *Beauford*, 35 F.4th at 1261. Second, the Court will decide whether Vigil-Richards's conduct violated Laycock's constitutional or statutory

rights under the "deliberate indifference" test. *Id.*; *Wilson*, 501 U.S. at 303. As explained below, the deliberate indifference inquiry is comprised of two prongs: one objective and one subjective. *Farmer*, 511 U.S. at 838-39.

The Court has discretion in deciding whether to evaluate the clearly established law or the deliberate indifference inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the Court begins by considering whether Laycock has shown that clearly established law demonstrates that it is unconstitutional to shackle an inmate during labor and delivery.[6] Because there is no Supreme Court or Tenth Circuit precedent on the issue and the weight of pertinent authority does not demonstrate that right is "clearly established," the Court will not engage in an academic analysis of the deliberate indifference inquiry as to Laycock's shackling. Then, the Court concludes Laycock's claim of inadequate medical care fails for the converse reason; she has not satisfied the subjective prong of the deliberate indifference inquiry.

### A. Clearly Established Law

"A right is clearly established for qualified immunity purposes if 'every reasonable official would have understood that what he is doing violates that right.'" *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Ordinarily, this means "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Schwartz v. Booker*, 702 F.3d 573, 587 (10th Cir. 2012) (citation modified). When considering this issue, courts should not "define clearly established law at a high level of

[6] Laycock also asserts case law clearly demonstrates that "holding an inmate in solitary confinement . . . in deplorable conditions raises serious constitutional concerns." ECF No. 133 at 16. Given that Vigil-Richards moves for summary judgment on Laycock's medical care claim—not her conditions of confinement claim—the Court does not analyze whether Laycock had a clearly established right to not be placed in solitary confinement.

generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Ultimately, the Court must "consider whether . . . precedents render the legality of the conduct undebatable." *Lowe v. Raemisch*, 864 F.3d 1205, 1211 (10th Cir. 2017).

Laycock "bears the burden of citing" what she believes "constitutes clearly established law." *Crane*, 15 F.4th at 1304 (citation modified). To do so, she contends "the universal consensus of the federal courts to have addressed the issue" conclude "that shackling pregnant prisoners during labor runs afoul of the protections" within the United States Constitution. ECF No. 133 at 17. She cites three-out-of-circuit opinions for support. *Id.*

The Sixth, Eighth, and Ninth Circuits have each held that a pregnant inmate had a constitutional right to not be restrained during her labor and delivery. *See Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 533-34 (8th Cir. 2009) (concluding the plaintiff had a clearly established right not to be shackled absent clear and convincing evidence that she was a security or flight risk while in the final stages of labor); *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 569 (6th Cir. 2013) ("[T]he shackling of pregnant detainees while in labor offends contemporary standards of human decency such that the practice violates the Eighth Amendment's prohibition against the 'unnecessary and wanton' infliction of pain'—i.e., it poses a substantial risk of serious harm." (quoting *Estelle*, 429 U.S. at 104)); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1254 (9th Cir. 2016) (concluding, in part, the plaintiff "presented sufficient evidence for a reasonable jury to conclude that by restraining [the plaintiff] when she was in labor and postpartum recovery, the County Defendants exposed her to a substantial risk of serious harm").

Though Laycock has presented on-point case law, she did not locate "a Supreme Court or Tenth Circuit decision" on the issue. *Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006); *see* ECF No. 133 at 10 ("Following a diligent search, Plaintiff has found no 10th Circuit case

addressing this issue[.]"). Meaning, the reasonableness of shackling a pregnant inmate during labor and delivery is not "beyond debate" within this Circuit or under Supreme Court precedent. *Ashcroft*, 563 U.S. at 741. While that alone is not fatal to Laycock's arguments, it means she needed to demonstrate the "clearly established weight of authority from other courts must have found the law to be as [Laycock] maintains." *Walker*, 451 F.3d at 1151. She has not done so.

Besides Sixth, Eighth, and Ninth Circuit rulings, case law on this particular issue is "underdeveloped." *Villegas*, 709 F.3d at 569. Therefore, the right of a pregnant detainee to be free from restraints during her labor and delivery was not "clearly established" from November 2020 to March 2021. Accordingly, Vigil-Richards could not have known her order to restrain Laycock during her off-site appointments, including her labor and delivery, violated Laycock's constitutional rights. The Court will not consider this claim under deliberate indifference test.[7]

As to Laycock's inadequate medical care claim, she again fails to meet her burden to supply clearly established law because she has not supplied pertinent authority from the Tenth Circuit or the Supreme Court. ECF No. 133 at 16 (citing case law about "holding an inmate in solitary confinement" and "a pre-trial detainee suffering from severe mental illness" being "held in a cell for fifty-six days"); *see, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005) ("[T[here [was] little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right."); *Blackmon*, 734 F.3d at 1245 ("[B]y 1997 it was clearly established law that

---

[7] Even if the Court considered Laycock's argument under the other qualified immunity prong, the parties have not addressed the standards to be employed when assessing the constitutionality of a detainee's shackling during labor and delivery. Would that claim be construed as a conditions of confinement challenge, or would the standards under the medical-care jurisprudence guide the analysis? *See Villegas*, 709 F.3d at 569-71 (discussing the "crossover nature of a pregnant shackling claim" as recognized in *Nelson*, 583 F.3d at 526, which combines language from medical-needs and conditions of confinement cases). It appears that issue has yet to be addressed in the Tenth Circuit.

the deliberate disregard of a patient's psychological needs can violate a detainee's constitutional rights no less than the deliberate disregard of his physical needs."); *Beauford*, 35 F.4th at 1262 ("The right to custodial medical care is well settled."). Notwithstanding this, the Court will address the deliberate indifference test as to Laycock's medical care claim.

**B. Deliberate Indifference Test**

Under the objective prong of the deliberate indifference test, Laycock must produce evidence showing that her medical needs were "sufficiently serious." *Farmer*, 511 U.S. at 834. A detainee's medical need—including a psychological condition—fits this definition "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Beauford*, 35 F.4th at 1262 (citation modified); *see Blackmon*, 734 F.3d at 1245.

Here, the objective prong is easily resolved. Given Laycock's documented mental health history and diagnoses, her ongoing psychosis and mental illnesses constitute "sufficiently serious" conditions.[8] *See* UMFs 23, 25; AMF C; *see, e.g.*, *Gray v. Geo Grp.*, No. 17-6135, 727 F. App'x 940, 2018 WL 1181098, at *4 (10th Cir. Mar. 6, 2018) (holding, on a motion to dismiss, the plaintiff's alleged diagnosis and treatment for bipolar, depressive, and psychotic disorders established the objective component of the plaintiff's deliberate indifference claim). Further, looking at her suicidal statements and self-harm, Laycock's need for mental health treatment was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Beauford*, 35 F.4th at 1263; *see, e.g.*, UMFs 8, 23, 25, 27, 28.

[8] Laycock's pregnancy would also be considered "sufficiently serious." *See Horton*, 123 F. App'x at 371. She does not argue this point.

The subjective prong is not as clear cut. Under this half of the deliberate indifference test, Laycock must demonstrate Vigil-Richards had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. To make this showing, Laycock may provide evidence that Vigil-Richards either (1) knew Laycock faced a substantial risk of harm and still took no measure to abate that risk, or (2) delayed or denied Laycock treatment that resulted in "either unnecessary pain or a worsening of her condition." *Mata*, 427 F.3d at 755. "Even a brief delay may be unconstitutional." *Id.* Existence of a defendant's subjective state of mind may be inferred from the fact that the risk of harm was obvious. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Based on the undisputed evidence, Laycock received timely medical and mental healthcare at WNMCF. Laycock had multiple medical appointments at WNMCF and off-site. *See, e.g.*, UMFs 14, 22, 24-26, 29-31. Specifically, she was seen by medical staff for five consecutive days in December 2020, UMF 29; had five on-site appointments in January 2021, UMF 29; attended two appointments in February 2021, *id.*; and was transported off-site four times. UMF 31. The undisputed record establishes Laycock's physical health was attended to. As to her mental healthcare, WNMCF behavioral health staff continuously monitored Laycock and offered her individualized physiciatric treatment. UMFs 5, 22, 26, 28, 32. In addition to conducting psychiatric assessments and prescribing mental health medications, WNMCF behavioral health staff recommended Laycock be placed in the LTCU and on therapeutic watch following her suicidal statements and self-harm. *See* UMFs 8-9, 28. In all, the undisputed evidence demonstrates WNMCF behavioral health staff heeded Laycock's need for medical and mental healthcare.

This directly relates to Vigil-Richards's asserted deliberate indifference because, when warden, Vigil-Richards "generally may rely on the advice and course of treatment prescribed by medical personnel." *Beauford*, 35 F.4th at 1265. This would not apply if it were obvious to a

layperson that Laycock was receiving inadequate or inappropriate treatment. *See id.* (citing *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009), and *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)). But that was not the case here. Even when viewing the evidence described above in the light most favorable to Laycock, Sharpton and WNMCF mental healthcare providers took the lead in providing Laycock medical care. Thus, the series of medical and mental health appointments Laycock had does not evince deliberate indifference by Vigil-Richards. *See Buchanan v. Elliott*, No. CIV 19-029, 2021 WL 1206405, at *7 (E.D. Okla. Mar. 30, 2021) ("Where there is such evidence of a 'series of sick calls, examinations, diagnoses, and medication . . . it cannot be said there was a "deliberate indifference" to the prisoner's complaints.'" (quoting *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976)).

Moreover, it is unclear whether Vigil-Richards was aware of Laycock's treatment and appointment schedule prior to March 1, 2020. It is not enough that Laycock speculates "Vigil-Richards *would have been well-aware*" of Laycock's "prolonged and intense mental health crisis." AMF G (emphasis added). Laycock must offer proof. But, based on the record, there is no indication Vigil-Richards disregarded Laycock's well-being or care, nor stood in the way of her timely treatment.[9] Further, there is also no evidence Vigil-Richards was aware, or should have drawn the inference, that Laycock faced "a substantial risk of serious harm" and did not act to

[9] Laycock provides Dr. Zachary Rosner's Expert Report for support. *See* ECF No. 133-9. In it, Rosner opines on the effects of shackling Laycock during her medical appointments and her labor and delivery, as well as details other safety risks during pregnancy. *See id.* at 5-9; *id.* at 8 ("The consistent use of cuffing and shackling experienced by Ms. Laycock during her pregnancy is in conflict with recommendations of major medical societies."). Laycock's reliance on this expert report is insufficient to substantiate Vigil-Richards's knowledge of, or deliberate indifference to, the extent of Laycock's medical care, however. While Rosner opines on the level of care expected of correctional or medical staff for detainees, the report does not examine Vigil-Richards' conduct nor that expected of a warden. *See id.* at 9 (opining as to how "*a reasonable medical provider* would have significant concern for a pregnant patient's safety if faced with prolonged isolation, shackling, and other conditions that Ms. Laycock experienced" (emphasis added)).

prevent the harm or provide Laycock treatment. *Farmer*, 511 U.S. at 837. Ultimately, Laycock has not proven the subjective prong of the deliberate indifference test.

In sum, a reasonable jury could not find Vigil-Richards acted with deliberate indifference to Laycock's medical and mental healthcare. Accordingly, the Court's analysis of Vigil-Richards's motion for summary judgment concludes here. Laycock has not shown clearly established law applies to her shackling claim, and she did not prove the subjective prong of the deliberate indifference inquiry concerning her inadequate medical care claim. As a result, Vigil-Richards is entitled to qualified immunity on both of those claims.[10]

## II. NMCD's Motion for Summary Judgment, ECF No. 119

In her second and third causes of action, Laycock alleges NMCD violated both the ADA, 42 U.S.C. §§ 1231-1234, and Section 504 of the Rehabilitation Act, for failure to accommodate her disability. ECF No. 43 at 15, 17-18. NMCD argues it is entitled to sovereign immunity under the Eleventh Amendment of the United States Constitution, thereby barring Laycock from pursuing either claim. ECF No. 119 at 5.

In *United States v. Georgia*, the United States Supreme Court established a three-part test for determining whether Eleventh Amendment immunity applies to a state prisoner's Title II claim for money damages. 546 U.S. 151, 159 (2006). Under that framework, the Court must "determine in the first instance, on a claim-by-claim basis, . . . which aspects of the State's alleged conduct violated Title II." *Id.* If the Court concludes that some aspects of the State's conduct were contrary to Title II, then it must determine "to what extent such misconduct also violated the Fourteenth Amendment." *Id.* "Notably, the Supreme Court has made clear that the Fourteenth Amendment

[10] Laycock's inhumane conditions of confinement claim is unaffected by this ruling. ECF No. 43 at 11-15.

incorporates against the states the Eighth Amendment's prohibition against cruel and unusual punishment . . . As to any such acts of misconduct, Congress's abrogation of the states' Eleventh Amendment immunity is constitutionally valid." *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1168 (10th Cir. 2021) (citing *Georgia*, 546 U.S. at 157-59). Finally, step three of the *Georgia* framework requires the Court consider: "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159. Before engaging with this three-part framework, the Court outlines the law as to ADA and Rehabilitation Act claims.

"Title II of the ADA makes it illegal for a 'public entity' to discriminate against a qualified individual with a disability in the provision of government programs, activities, and services." *Brooks*, 12 F.4th at 1167 (citing 42 U.S.C. § 12132); *see also* 42 U.S.C. § 12102(1) (defining "disability"). State prisons, like WNMCF, fall within the category of "public entities" under both Title II of the ADA and the Rehabilitation Act. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998); *Ingram v. Clements*, 705 F. App'x. 721, 725 (10th Cir. 2017).

"The law places an affirmative obligation on public entities to reasonably accommodate qualified individuals with disabilities to allow them to participate in its programs and services." *Crane*, 15 F.4th at 1312 (citing 28 C.F.R. § 35.130). In order to prove a Title II violation under a reasonable accommodation theory, Laycock must show: (1) she is "a qualified individual with a disability;" (2) she was "either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (3) "such exclusion, denial of benefits, or discrimination was by reason of [her] disability." *Id.* (citation modified).

The Rehabilitation Act proscribes the same discrimination. No individual with a qualifying disability "shall, solely by reason of her . . . disability," be excluded from programs or activities that receive federal financial assistance. 29 U.S.C. § 794(a).

The Tenth Circuit "typically evaluate[s] claims identically under the ADA and Rehabilitation Act" except for one aspect: the causation standard.[11] *Crane*, 15 F.4th at 1312; *see Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 726 (10th Cir. 2011). The Rehabilitation Act requires the plaintiff's disability be the "sole cause" of the discrimination, whereas the ADA necessitates a lesser but-for causation standard. *Crane*, 15 F.4th at 1313 (collecting cases); *compare* 29 U.S.C. § 794(a) (prohibiting discrimination against qualified individuals "solely by reason of [their] disability"), *with* 42 U.S.C. § 12132 (prohibiting discrimination "by reason of such disability"). The Court begins by analyzing Laycock's ADA cause of action.

**A. The ADA Claim**

The Court resolves NMCD's motion for summary judgment at the first step of the *Georgia* framework. 546 U.S. at 159. It is undisputed Laycock is a qualified individual with a disability. ECF No. 135 at 2 ¶ A. What the parties contest, instead, is whether Laycock put forth proof of the second and third elements of her ADA claim—those being, whether she was "either excluded from participation in or denied the benefits of some public entity's services, programs, or activities," and that "the exclusion, denial of benefits, or discrimination was by reason of [her] disability." ECF No. 119 at 6; *Crane*, 15 F.4th at 1312.

Laycock avers that "[d]ue to her serious mental disability," she was held in J Pod and the LTCU while at WNMCF contrary to the ADA. ECF No. 135 at 3 ¶ C. As a result, she claims she

[11] There are limited exceptions to evaluating these two statutes identically. *See Crane*, 15 F.4th at 1302 n.4 (outlining exceptions); *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1262 (10th Cir. 2018) (same). None apply here.

was denied access to "programming provided to prisoners without serious mental disabilities," including recreation, and received "almost no mental healthcare" to address her ongoing psychosis. ECF No. 43 at 16 ¶¶ 143, 144; ECF No. 135 at 3 ¶¶ E, F, H. She provides no more detail beyond these conclusory assertions. *See, e.g.*, ECF No. 135 at 3 ¶ C ("Due to her serious mental disability, Defendant NMCD's staff and contractors held Plaintiff in a toxic, non-therapeutic environment in extremely harsh conditions in housing unit J Pod and in the [LTCU] at [WNMCF.]"); *id.* ¶ E ("During this period, Plaintiff was denied access to any of the programming provided to prisoners without serious mental disabilities."); *id.* ¶ F ("[Laycock] didn't even receive access to the recreation provided to prisoners without serious mental disabilities."). Even when drawing the facts and inferences in the light most favorable to Laycock, she has not specifically identified which "services, programs, or activities" she was excluded from accessing as a result of being in "solitary confinement," let alone demonstrate that such exclusion was by reason of her disability.

"Losing access to public services for behavioral reasons, even where that behavior might be related to underlying mental health disabilities, is insufficient to prove disability discrimination." *Encinias v. N.M. Corr. Dep't*, 659 F. Supp. 3d 1227, 1244-45 (D.N.M. 2023), *aff'd*, No. 23-2052, 2024 WL 4380477 (10th Cir. Oct. 3, 2024) (citing *Crane*, 12 F.4th at 1313-14) (holding that placing prisoner in isolation as behavioral punishment is distinct from deprivation based on mental diagnosis and upholding dismissal of the ADA claim). Laycock also does not provide evidence that she requested accommodations or that WNMCF correctional staff denied any such request by reason of her disability. Similarly, Laycock cites no proof of when she was denied recreation, who made that decision, and whether that occurred by reason of her disability.

To prove an ADA claim, Laycock was required to put forth "some affirmative evidence that disability was a determining factor." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259

(10th Cir. 2001) (considering the plaintiff's claim for discriminatory discharge). After all, there are many reasons a detainee may be moved between housing units, placed in restrictive housing, or denied recreation that is unrelated to their disability. For instance, if Laycock presented evidence that she was denied recreation or was placed in either J Pod or the LTCU as behavioral punishment by reason of her psychosis, then the Court's analysis may have differed.

Finally, Laycock asserts she received inadequate medical care violative of the ADA. *See, e.g.*, ECF No. 135 at 7. But a plaintiff's claim for a prison official's failure to provide adequate medical care does not constitute an ADA violation. *See Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001) ("[T]he failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation."); *Nasious v. Colorado*, 495 F. App'x 899, 903 (10th Cir. 2012) ("But the ADA does not provide a remedy for medical negligence or a means to challenge 'purely medical decisions' regarding the propriety of a course of treatment."). This argument must fail at the summary judgment stage.

Consequently, Laycock has failed to prove what "aspects of the State's alleged conduct violated Title II." *Georgia*, 546 U.S. at 159. The Court does not analyze the remaining steps of the *Georgia* test. NMCD is entitled to sovereign immunity under the Eleventh Amendment as to Laycock's ADA claim. *See id.*

**B. The Rehabilitation Act Claim**

Laycock's Rehabilitation Act claim suffers the same fate. The FAC states in conclusory fashion, "NMCD's conduct, and the acts of [*sic*] admissions of its employees and contractors,

violates Section 504 of the Rehabilitation Act." ECF No. 43 at 18 ¶ 157. Her response briefing does not expand upon this assertion. *See* ECF No. 135 at 8-9.

Ultimately, Laycock has not shown there is a dispute of material fact regarding whether she was denied access to programming at WNMCF due to her disability. Thus, NMCD is entitled to Eleventh Amendment sovereign immunity as to Laycock's Rehabilitation Act claim.

**CONCLUSION**

Under the doctrine of qualified immunity raised at the summary judgment stage, Laycock needed to show (1) that Vigil-Richards's actions violated Laycock's constitutional or statutory rights, and (2) those rights were clearly established at the time of Vigil-Richards's alleged misconduct. *Beauford*, 35 F.4th at 1261. After reviewing the undisputed facts and evidence in the light most favorable to Laycock, she did not meet her burden. Laycock did not demonstrate that clearly established law showed it was unconstitutional to shackle a pregnant inmate during her labor and delivery. Consequently, the Court did not assess whether Laycock's shackling violated the deliberate indifference test. As to Laycock's inadequate medical care claim, she failed to prove the subjective prong of the deliberate indifference inquiry regarding Vigil-Richards's knowledge.

Therefore, for the reasons explained above, Vigil-Richards is entitled to qualified immunity on Laycock's allegations of unconstitutional shackling during her labor and delivery and her inadequate medical care claim under the Fourteenth Amendment. ECF No. 43 at 11-15. Qualified immunity shields Vigil-Richards from liability for these two claims. Laycock's inhumane conditions of confinement claim under the Fourteenth Amendment is unaffected by this ruling. *Id.*

As to Laycock's ADA and Rehabilitation Act claims, she has failed to surmount the tall hurdle of Eleventh Amendment sovereign immunity. Specifically, Laycock did not put forth proof of her alleged exclusion from participation in or the denial of the benefits of WNMCF's "services,

programs, or activities," and also did not explain how "such exclusion, denial of benefits, or discrimination was by reason of," or due to, "[her] disability." *Crane*, 15 F.4th at 1312. Consequently, Eleventh Amendment Immunity inhibits her claim under both the ADA and the Rehabilitation Act from moving forward. *See Georgia*, 546 U.S. at 159.

It is hereby ordered that Defendant Jessica Vigil-Richards's Sealed Motion for Summary Judgment Based Upon Qualified Immunity, ECF No. 118, is **GRANTED**. Laycock's claims for inadequate medical care and shackling under the Fourteenth Amendment are therefore **DISMISSED with prejudice**.

It is further ordered that Defendant New Mexico Corrections Department's Sealed Motion for Summary Judgment on the Basis of Eleventh Amendment Immunity, ECF No. 119, is **GRANTED** and Laycock's second and third claims are **DISMISSED with prejudice**.

SENIOR UNITED STATES DISTRICT JUDGE